United States v. Torrez. And we talked briefly before coming in here, and certainly counsel are privileged to argue whatever they think is important in their mind, but we would urge the lawyers to pay particular attention to the issues regarding sentencing in this case. With that, Ms. Stelzig, go ahead. Thank you, Your Honor. Good morning. May it please the Court, Julie Stelzig together with Robert Lee on behalf of the appellant, Jorge Torrez. With the Court's remarks in mind, of course, this case presents a large number of important and complex issues, far too many for me to address in the time permitted. And while I welcome questions from the panel on any issue from the briefs and the record, I would like to focus on two aspects of this case in particular that mark it as an outlier among death penalty cases. Number one, that Mr. Torrez's eligibility for the death sentence was based solely on post-offense convictions. And number two, that Mr. Torrez was permitted to waive virtually every right fundamental to a fair trial throughout the eligibility and sentence selection phases without the Court first determining that he was competent and understood the scope and consequences of those waivers. Ms. Stelzig, you want to move that mic a little bit closer to you so I can hear if we can hear you better? Thank you. And if there's time, we would also like to touch briefly on the application of the categorical approach to the statutory eligibility factors. I hope the issue that I've identified as our second issue is what the Court had in mind with sentencing issues. Of course, if there are other issues with respect to sentencing the Court would like me to address, I'm prepared for those. Turning first to the timing issue, eligibility for the death penalty cannot turn on factors that are arbitrary or can be subject to manipulation by either parties. And yet in this case, on the date of Ms. Snell's murder, July 11, 2009, Mr. Torrez could not have been charged with capital murder. The greatest punishment the law allowed on that date was life imprisonment. It was only by waiting until 2011, after Mr. Torrez had been convicted of separate State offenses in 2010, was the Government able to seek the death penalty. Wait a minute. Are you suggesting that the Government acted intentionally with respect to that? Well, certainly the Government acted intentionally in waiting until 2011. If the Court is asking whether... I suppose there's no way that the Government could have been prescient in knowing what Mr. Torrez was going to be up to after he committed the initial murder. Your Honor, our point is that because Mr. Torrez was... his only basis for death eligibility were post-offense convictions, and if death eligibility can depend on things such as the speed of relative dockets or the speed of, you know, how different prosecutors move, or presents the opportunity for manipulation. Now, we do have issues in this case that certainly raise concern. Beginning as early as July of 2010, we know that there were overlapping investigations, overlapping witnesses. We know that the Federal prosecutors were involved in wiring up Mr. Elatary to obtain statements from Mr. Torrez. The Virginia jurisdiction was responsible for getting cell site information in July of 2010 that, again, could only be relevant for the Federal investigation. But our argument does not turn on whether the prosecutor is acting with a bad intent. Really, the focus is... And just to be clear, you don't have any evidence that the Government was acting with a bad intent here, do you? We're not... from the record that we... what's in the record before us does not present that issue. Again, there are these overlapping concerns, which I think should give the Court pause. But I think the larger concern is not whether an individual prosecutor is acting with bad intent. The point is, is there an arbitrary factor, such as the timing of court dockets, that is creating the difference between a life and a death sentence? And in non-capital context, this Court found in Presley that it would be absurd to allow a 15-year mandatory sentence under the Armed Career Criminal Act to turn on the fortuity of a sentencing date. And the Court cited... Well, but you were dealing with an entirely different statute there, so I guess you need to focus on this statute. And what is it about this statute that suggests the reading that you want to attach to it? Well, the Supreme Court has made clear, going back as far as Furman, and that's been reaffirmed in Gardner and Arevey and a number of other cases, that the death penalty cannot turn... eligibility for death can't turn on factors that are arbitrary. And the Court uses language such as the selection process has to be even-handed, objective. It has to be based on reason rather than caprice. And when the timing of when a case goes to court first or when there is this potential, again, even if we don't have bad intent, both sides are going to have strong incentives to try to game the timing of respective convictions if the outcome is going to depend on whether the person is eligible for death. Presumably, Mr. Torres' attorneys in Virginia, if they had been aware that a conviction in that case would subject him to the death penalty when he otherwise would not be subject to that, presumably they would have taken considerable steps to try to, you know, kind of interfere with that process. So the point is that there is this... I don't know what you mean by that. So what do you mean by that? I assume that lawyers in those cases did what they were supposed to do. They defended your client. Well, the point is, Your Honor, in a usual case, there are other factors that make a defendant eligible for the death penalty. And so the timing of the aggravators may not take on as much concern because if nothing else, those factors could be considered at the sentence selection phase as part of the individualized... Was the government aware that he was a suspect in the Snell murder? I mean, Your Honor, one of... I mean, it certainly appears that way. Again, not all of this is in the record, but he was identified as a suspect in the Snell murder shortly after he was arrested. If you're suggesting that there was some issue with respect to the timing of this case that a suspect, should not that have been an issue in this trial? Your Honor, our argument does not depend. We are making a facial argument under the Eighth Amendment that if the statute can be applied to post-offense convictions, then that violates the Eighth Amendment. So tell me again, what is arbitrary about that? Well, again, the fact that Virginia proceeded to trial first is not a factor that is relevant to whether or not Mr. Torres should be subject to the death penalty. When you have a factor that has the potential to be manipulated by interested parties, that violates the Eighth Amendment. Now you're suggesting again that there was some intent involved with the order of these prosecutions, and I'm having trouble with that connection because every time we suggest that and ask you about it, you back away from it. Well, Your Honor, again, the language that the courts use, whether it's in the capital context or whether it's in the noncapital context, courts focus on the potential for manipulation. It's not evidence of actual manipulation. How do you distinguish Higgs on this issue? Well, Your Honor, Higgs was not presented with the issue of eligibility. It's clear if you look at the briefs, if you listen to the oral argument, that the focus of that case was on the only argument that Higgs counsel made with respect to the timing of the one previous conviction aggravator is that it skewed the weighing process. Well, and that's because Higgs wasn't a trifurcated proceeding, right? Well, that was only one — that was certainly one factor that influenced the Court's decision. But when Higgs counsel was asked point blank at oral argument, what happens if we invalidate this one post-offense conviction and Higgs counsel had to concede that his client was still eligible for the death penalty? And one cannot read the Higgs decision without seeing that eligibility was just not a factor. And the Higgs Court did not consider any of the constitutional arguments that we are raising. Well, but let me go back to this issue of trifurcation. It seems odd that a process that the government consents to that's not required by the statute, all of a sudden creates a potential sentencing issue with respect to the fact that these — with respect to the existence of these prior convictions. That doesn't make any sense to me. If we were dealing with a bifurcated proceeding, perhaps you would make this argument, but you'd have a much more difficult time making the argument. Well, Your Honor, there's still certainly the fact that Higgs was considering a trial that had been tried before Ring had been decided and in a bifurcated proceeding. That certainly influenced their decision. But their decision was also based on the fact that this was not — they were treating, for all intents and purposes, the prior conviction aggravator as a sentencing factor. The decision states clearly that we only need one statutory aggravator to make a person eligible for death, and that functions as an element. All of the other statutory aggravators are essentially sentencing factors. That's how the Higgs Court treated this previous conviction aggravator. And again, the Court was never presented or asked to decide the constitutional arguments that are presented in this case. There were purely statutory arguments and a Fifth Amendment indictment argument. And so the Higgs Court was just never presented with this issue because eligibility was not a factor. If I could turn now to the question of the waiver, that seemed to be of interest to the Court. I'm sorry, one last point. Your Honor, I would just remind — ask the Court to look. There were two cases we cited in our brief. One was Jackson, which was out of the Fifth Circuit, in which a person was killed an inmate in jail, was released from jail, and four years later committed a bank robbery and was charged with death penalty for the earlier murder. That's an example of how extreme this can go in its actual application if the timing of the aggravator doesn't matter vis-a-vis the murder. The other case I would draw the Court's attention to is Pennsylvania v. Boskowski, which is the only other case I could find in which death eligibility was based solely on post-offense convictions. And there the Pennsylvania Supreme Court said this would inject an unfair and arbitrariness into the death penalty process, and they struck the death penalty in that case. So I would just draw the Court's attention to those two cases. Turning to the waiver issue, I want to make very clear up front, because this issue got a little bit, I think, muddied in the government's brief. This is not just a question of a waiver of mitigation. The scope here of the rights that were waived were much broader. Mr. Torres was permitted to waive virtually every right to challenge the government's case throughout the entirety of both the eligibility and the sentence selection phases. And that distinction is important because in the eligibility phase, number one, Mr. Torres was still entitled to a presumption of innocence on the capital murder charge, and he had a full range of trial rights. At the sentence selection phase, of course, he still had significant constitutional rights, although perhaps of slightly different dimension than in the eligibility phase. So throughout those stages, there was no opening or closing statement, no cross-examination of any witnesses, no objections to any evidence, no presentation of their own witnesses or exhibits, no objection to issues, to preserve issues for appeal, no input into modifications to the jury instructions, a complete absence of adversarial challenge throughout these two critical points at trial. And is it your position that a defendant can never effectuate that kind of a waiver? Your Honor, the Court doesn't need to decide that issue. That's not the issue that we're raising. I want to focus on two aspects of this waiver today. One, that the Court abused its discretion in failing to hold a competency hearing before allowing Mr. Torres to waive this sort of breathtaking scope of rights, and also that the Court did not take steps to ensure that the waiver was knowing and intelligent. Turning first to the competency issue, the standard here, as the Court knows, is whether the Court had reasonable cause to believe that Mr. Torres was not competent. And the Court has to accept as true all evidence of incompetence that it finds, and that includes the defendant's demeanor in the courtroom, previous evaluations, and other records that it has before it. Now, if we look at Dusky, the Dusky standard is very important because Dusky uses the word rational not once but twice. Competency means that the defendant has the sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, and that he has a rational as well as factual understanding of the proceedings. So there was, if we, and I want to focus the Court on the number of things that the district court had before in April 2014 when this waiver was taking place that provided reasonable cause and should have prompted a hearing. Before you do that, just refresh my recollection. There was a competency hearing in this case. When did that occur? Your Honor, there was actually not a competency hearing. There was a competency evaluation that was done in February of 2013. So it had been 14 months prior. All right. And just touching on that evaluation, the Court did appear to rely on that evaluation, presumably, but that evaluation was based solely on a three-hour interview with the defendant, did not look at any of his records, did not consult with the defense mental health experts, assumed that there were only two mental health experts working for the defense when, in fact, there were six, and didn't actually consult with any of them. And he noted that even though it's preferable, he didn't consult, he didn't look at any medical records, school records, talk to any family members, or look at any other type of information that typically one would do if you had a full-blown hearing. So that was the evaluation. And the other thing to remember about the evaluation of Dr. Ratner is that at the time that that was done, in February of 2013, everybody knew because the defense had submitted pleadings a few days prior to that evaluation that Mr. Torres was no longer interested in representing himself. What he really wanted was a substitution of counsel. So what was at stake at the moment that that evaluation was being done and considered was not a waiver of any fundamental rights, but it was whether I think the Court just wanted to satisfy itself that, you know, there wasn't – it was almost like kind of a check the box, let's do this, because earlier the Court had referred to sending Mr. Torres down to Butner to do a full evaluation the first time he mentioned self-representing. So it's clear that at that moment that Dr. Ratner is performing this evaluation, everybody understood that there was no fundamental rights at stake. This was really, let's get this done, and then we'll substitute counsel. So then we fast forward to 14 months later. Now, of course, an evaluation from 14 months before is not going to control what's happening in any event, because the standard under Dusky is whether there's a presentability, and the Court has to be cognizant of any changes. But even if we look at what the Court had at the time of the first evaluation, there was a declaration from one of the defense experts, George Woods, who's a nationally renowned neuropsychiatrist, and he said it was based on his opinion based on five months of working with the defense and a review of a substantial number of educational neuropsych testing and review of documents from family members, that Mr. Torres was suffering from a significant and profound mental illness and brain dysfunction. And he listed the things that needed to be done in order to complete his evaluation and diagnosis to specify what exactly the nature of that mental illness was. We also had, shortly after that, defense counsel telling the judge, Dr. Woods and other experts tell us that we have a significant mental health issue. We're either going to litigate this now or we're going to litigate it in post-conviction. We also had Mr. Torres' behavior, such as sending letters to the Court, including in one letter where he said his attorneys told him that people would target his family members and kill them if he went to trial. We had Mr. Torres, again, right after the Ratner evaluation, the judge ordered Mr. Torres to be shackled in the courtroom over his attorney's objections because of concerns about how Mr. Torres would behave when he heard evidence about the defense mitigation investigation into the mental health issue. There was also the longstanding resistance that Mr. Torres was putting up to all investigation into mental illness, which is, of course, not uncommon with individuals suffering from mental illness. And Dr. Woods noted that in his declaration, that consistent with someone with mental illness, he doesn't have much insight into his symptoms or into his mental illness. And there was also just a few months before this exchange, again in April, the judge had had a number of conversations with Mr. Torres because he was refusing to trim his nails. And the judge was saying, well, I'm going to have to order you to wear heavy gloves or I'm going to order the marshals to do it. So there was this continuing pattern of odd behavior. And it was enough that it prompted the judge on his own to reach out to the detention center to find out if there had been any change in status and asked Mr. Torres if there was any change in status. But that was not sufficient. What's required under 4241 is to conduct an actual hearing. And the court didn't do that. And the last thing that the court had, again, if we're focusing on the time of the actual waiver in April 2014, what the court had was Mr. Torres' counsel questioning whether Mr. Torres met the rationality standard. And that's important, again, because that ties back to the Dusky Standard. And they noted this tension between Mr. Torres' desire on the one hand to be acquitted of the Snell murder and on the other hand to avoid serving a life sentence. And that is in internally, rationally inconsistent positions because an acquittal on Ms. Snell's murder would mean serving a life sentence in Virginia. And this was the same tension that was noted in Dr. Ratner's report 14 months before. And Dr. Ratner said, well, I don't need to resolve this now because the only issue we're dealing with now is guilt-innocence. And so he limited his evaluation, as limited and as preliminary as it was, he was expressly limited by Dr. Ratner to the guilt-innocence phase and said, if this is an issue, you know, if this issue continues and we get to these later stages of trial, I assume the court will address it then. And now we're at that point where Dr. Ratner's evaluation no longer applies, the court has all of this other evidence that's been stretching back since the beginning of trial, and the court didn't take any kind of inquiry or set another evaluation or have a hearing. And this Court's decision in Mason makes clear when you've got competing inferences in the record between competence and lack of competence, that by itself is a reasonable cause to believe the defendant is not competent. Even if the court wanted to credit Dr. Ratner's evaluation beyond the guilt-innocence phase, that tension between Dr. Ratner's opinion and Dr. Woods' opinion should have prompted a hearing where both of those experts could have been brought into court and explained their opinions. Was there anything about the actual interaction or exchange with Mr. Torres and Judge O'Grady that would have suggested an issue? I mean, a lack of competence issue? Well, Your Honor, yes. I mean, there were, as I mentioned, there were letters that Mr. Torres sent to the judge. No, no, no. I'm talking about the actual colloquy between Mr. Torres and Judge O'Grady in court the day that Mr. Torres decided to waive his rights. Well, was Mr. Torres acting, you know, flawedly delusional? I guess the point is we weren't there. We weren't there in the courtroom. And one of the factors that you yourself have conceded is sort of the demeanor of the defendant in the courtroom. And this is an abuse of discretion standard, so I'm asking you, was there anything unusual about the way in which Mr. Torres interacted with Judge O'Grady on that day that would have suggested to the judge that something was amiss? Your Honor, I was not present in the courtroom that day either, but that is, of course, just one factor. So what's the answer to that? Well, the answer is, Your Honor, I mean, mental illness takes many forms. I don't think you're answering my question. Well, Your Honor, your Honor's asking me was he acting in a manner that's consistent with mental illness. That takes many forms, so that's not a question that I can answer truthfully. Well, you indicated that there was this issue of his not being rational with respect to the decision to forego a sentencing hearing, understanding that he was going to be facing a life sentence in any event because of the sentence, so I'm asking you whether, based on this record, there was anything irrational about his interaction with the district court on the day of the hearing. Well, when the judge asked Mr. Torres, if he, the judge asked Mr. Torres directly, have you had any change in your mental health status, which, of course, an individual who doesn't have insight into his own symptoms would not perhaps be able to answer, but Mr. Torres never answered that question, and the judge didn't follow up on that. So that's issue number one. And number two, the judge didn't ever explore with Mr. Torres this fulcrum of irrationality that had been cited by Dr. Ratner and by his counsel. The judge never questioned Mr. Torres and said, explain your position to me so that I can understand it, and the judge just didn't even probe it at that level. So the fact that Mr. Torres was not, you know, throwing papers around or, you know, or doing something that was, you know, saying that the people were out to get him, I don't think that that's the standard. The standard is whether he has the ability to have a rational understanding of the proceedings and have a, you know, rational conversation with his attorneys. I don't know how much time you've got left, but when are you going to talk about the categorical argument in this case? I'm happy to turn to that. The Supreme Court has made clear, starting in Taylor and as recently as in Mathis, that there are three factors that the court should look at in deciding whether the categorical approach applies. The first is the language of the statute. And the Supreme Court has long made clear that when Congress uses, focuses on a defendant's previous convictions rather than a defendant's conduct, that calls for the categorical approach. And it's significant, this decision, the first decision in Taylor was in 1990, four years before the Federal Death Penalty Act was drafted. And Congress was presumed to know of the Supreme Court's interpretation when it chose that same language in the Federal Death Penalty Act. Second, we have, the Supreme Court has cited Sixth Amendment concerns. Well, that's adequately addressed because under, here the court would only be making a legal determination about whether the aggravating factors either categorically qualify or not. The jury would still make the determination about whether the conviction existed. And, for example, in C-4, they would make the determination whether there were two convictions that were, that occurred on, on different occasions. And third, there's the concern about unfairness to the defendants and, and the trying of having inconsistent results for two individuals who were convicted of the same offense based on the underlying conduct and the struggle to recreate underlying events for convictions that happened a long time in the past. Now, in this case, we do happen to have convictions that were recent. But often in, in capital cases, we have convictions that stretch back 20 years. So those unfairness concerns that the Court cited in Taylor and repeated in Mathis are, are all the more present. And the, the need to have uniformity is just as important, if not more so, under the Federal Death Penalty Act as it is under the Armed Career Criminal Act and the Immigration Act. Is this also a function of this trifurcation, or are you arguing that even in a bifurcated proceeding, these convictions would have been subject to the categorical, modified categorical approach? Well, Your Honor, Higgs did decide, again, in the context of a bifurcated proceeding, that it didn't apply. So I think that this Court can, can for now make the decision based on trifurcated. But there's no reason logically why the, why the, why the, why the approach wouldn't It's a bit odd to me that the government concedes to a process, a procedure that's not required on the face of the statute, and all of a sudden we're embedding this sort of approach, which heretofore had never been applied in a death penalty case, to this case. That seems a little odd. Well, Your Honor, I'm, in, in, in terms of looking at what was decided in Higgs and what was not, that's certainly one difference. There is also some language differences that I can talk about in Higgs that have been superseded by subsequent decisions. I'm sorry, I see my time is up. May I finish the question? Go ahead. Thank you. Logically, however, I would agree with you that, that application of the categorical approach would apply, or should apply, if we apply the reasoning in Taylor and through Mathis, it would apply even in a bifurcated proceeding. The Court would make a pretrial determination. This is what happens in the 924C context. The Court makes a pretrial determination on whether the convictions qualify categorically, and then if they do, then they go, they go to the jury, whether it's in a bifurcated or a trifurcated proceeding. All right. Thank you very much. Thank you. Good morning. May it please the Court, Jim Trump and Richard Cook of the United States. I would like to focus a little bit on the chronology of this competency issue because it stretches back. It wasn't just an isolated hearing in April of 2014. It stretched back to 2012 in which Mr. Torres made a pro se request. I need to move that mic a little bit closer to you as well. Yes, I apologize. Allergies have scratched my throat a little bit. Back in 2012, Mr. Torres had suggested that he could proceed pro se, and that request was denied. Following that request, however, he stopped visiting with counsel because he was angry with counsel. Counsel had pursued a mitigation investigation over his objection. He did not want them contacting, recontacting, recontacting his family. He did not want them to go to Mexico to question relatives. And he sent a letter to the judge explaining this dispute very clearly, this dispute that he had with counsel. There was an ex parte hearing in 2012 in which Mr. Torres informed the judge that he doesn't trust counsel. He's willing to work with Mr. Stone, who was his counsel in Illinois. And it was primarily his request to change course with respect to mitigation that prompted this dispute. At the time of the competency hearing, he had expressed a desire to go pro se, but he also said to the judge that he would consider another counsel. So the competency hearing was both about whether he could proceed pro se as well as whether he could make a decision, a competent, rational, knowing, voluntary decision about whether to change counsel. Both of those issues were addressed by the court with counsel, with Mr. Torres, and then directing Dr. Ratner to address those issues. Well, Ms. Delzick says that notwithstanding your representations that he, at least in the letter, seemed to be coherent and cogent, that it was just simply irrational for this particular defendant to waive a mitigation case given the fact that he was already facing a life sentence in Virginia and that the judge should have inquired about that. The judge did inquire about that. And beginning, I believe it's around page 4400 of the appendix, there was an extended ex parte hearing with trial counsel, Mr. Torres, and the judge. Trial counsel addressed... Was that at the time of sentencing or... That was before the eligibility hearing began. How much before? The day before. Okay. There had been a gap between the close of the guilt phase and the beginning of eligibility. And before the recess, because of spring break, the judge addressed counsel and told them to discuss this with Mr. Torres, to find out what their position was going to be when they came back. And when they came back, they had this hearing. And at the hearing, the judge addressed counsel, asked counsel specifically about mental health issues, asked counsel to discuss whether they believed their client was competent, whether they had seen any changes in his behavior since the competency evaluation. Because the judge on his own had gone and checked with the marshals and with the jail to determine whether they had seen any changes, and counsel said no. There was nothing they could represent to the court. They said they had considered submitting affidavits to the court, but they frankly had nothing to submit that would support a finding on traditional tests of competency that the defendant was not competent to make this decision. Trial counsel had discussed with Mr. Torres what was at stake. They discussed with him this apparent irrationality between contesting guilt but then not contesting sentence. So the court addressed counsel about that, and they said that's his decision, that's what he wants. He's discussed it with Mr. Stone. He's discussed it with trial counsel. At the court's request, he discussed it with his family. And when Judge O'Grady addressed Mr. Torres, he went through that. He said, have you discussed it with counsel? Have you discussed it with your family? And he said he has, and he said, Judge, it's my decision. I know it appears irrational to you, but it's my choice, and it's the choice that I make. There was a very extended conversation with the court. And on the mental health issue in particular, the court asked for a proffer from trial counsel as to what their medication case would involve. And trial counsel said, frankly, Judge, we looked into all the mental health issues and it was a dead end, that we had MRI done, we went back over what previous counsel had done, and we have nothing to present. If we were allowed to proceed with mitigation, we would have nothing to proceed with on the mental health issue. So there weren't any mental health issues. I thought Ms. Stelzik summarized a report from one of the defendant's doctors that suggested some kind of profound mental health issues. When the original counsel was working on the case, they had started to explore mental health issues. And there were some things the mental health experts said they needed to go into further. New counsel went further. They had additional tests done. They had an MRI done at Georgetown. They had consultation with additional experts. And they advised the court, we were not privy to any of that evidence, we don't have any of those reports. All we have is what they advised the court prior to the eligibility phase hearing, that this is what our mitigation case would consist of, and they had no mental health component to offer. And that was their proffer to the court at that time. So they stood before the court and said, Judge, we don't have any evidence of any sort to suggest that Mr. Torres is not competent to make this decision. It was, by all counts, a knowing, intelligent, voluntary waiver of his right to put on a mitigation case. Trial counsel also discussed with the court whether Mr. Torres had that right, and they conceded that he did. They conceded that, I think it was Mr. Brennan had discussed it with bar counsel, and he had come to the conclusion himself that when the client directs you to do something like this, you have to do it. Now, Mr. Torres further wanted them to stand up and say that he did not contest the death penalty, and Mr. Brennan said, I'm not going to go that far. I will stand silent. They moved to withdrawal, but the court said, no, you can't withdraw, because Mr. Torres might change his mind. And after hearing the government's evidence, he might decide to put on a mitigation case, so we're going to keep you in the case. And he sort of likened it to standby counsel, which is a process and a procedure that is employed in a number of death penalty cases. Standing here, we think it was an irrational decision. But as Mr. Torres pointed out to his counsel, for example, in Misawi, Mr. Misawi represented himself in a capital sentence proceeding, and he received a life sentence. Christopher Wells, the case that I tried, he represented himself in a capital sentence proceeding, and he received a life sentence. So it's not irrational for a defendant to want to control his sentencing strategy. Even if that is no strategy? Even if that is no strategy. In a reply brief that was filed by Mr. Torres, they cite the Moody case, which came out of Alabama, and in that case, on habeas review, the court pointed out if you have forerunner rights, and if they mean anything, and if you can represent yourself, you can certainly represent yourself and stand silent if you choose in terms of a capital sentencing proceeding. Because that's what Mr. Moody did, and then subsequently he changed his mind and decided that was a bad choice. But once you have decided that a defendant has forerunner rights, which allow him to represent himself, the extension of that is that the defendant has the right to control what evidence is presented to the jury during sentencing. And this was Mr. Torres' decision. It may have been a bad choice, but it was his choice, and he made it after being apprised by the judge of the consequences of it. The court went into the fact that, for example, it would only take one juror to get him a life sentence, and he said he understood that. He understood the consequences of what he was doing. He understood that trial counsel thought it was a risky process, that it was an irrational process. But he stood before the court and said, it's my choice. The behavior that counsel pointed out that was irrational about, and the court wanted to shackle him, that came up in the context that he was very angry with his attorneys at that point. He had asked the attorney specifically not to do things. He had asked his attorney specifically about going to Mexico, about interviewing his family, and he felt his attorneys had lied to him. So the judge, out of an abundance of caution, given that Mr. Torres expressed anger with his attorneys, that's why he was shackled, not because the judge thought he was acting irrationally or somehow suffering from some sort of mental illness. We know for a fact that Mr. Torres did concern the marshals and the sheriffs, both in Arlington and Alexandria, because of the fact that he was caught with a shank. In the Arlington case, he is planning to try to harm the witnesses against him. So he was perceived as a violent person and capable of additional violence, but not because of any mental illness. If I could, I think Your Honor hit upon a point that we alluded to in our brief, the issue of bifurcation versus trifurcation. We raise that by motion because of a concern that had been expressed by defense counsel that somehow there would be undue prejudice if the jury was exposed to very damning facts about Zion, Illinois, in the eligibility portion of the case. So we agreed that we would split the eligibility phase and the selection phase to avoid a subsequent issue that would relate to undue and unfair prejudice. In hindsight, we haven't eliminated the issue. So perhaps in the future, we would not be so quick to agree to such a process. And courts most recently have questioned whether that process should even be employed, that the jury can understand the instructions. The instructions would be the same regardless of whether it's a bifurcated or trifurcated proceeding. The law is the same. There is no substantive difference between separating the selection phase from the eligibility phase or having them all in one hearing. So when Torres says we can distinguish Higgs because Higgs was a unitary sentencing proceeding rather than a bifurcated proceeding, we can't. Because there's no legal difference in the way that the court would instruct the jury. What concerns me here is that death eligibility in this case was based solely on post-offense convictions. Is there any other case where that has occurred? That didn't occur in Higgs, right? I don't know of any federal case where the sole statutory aggravating factors are like they are here. And by like they are here, you mean post-offense? Post-offense conduct. So he gets the death penalty for things that occurred after what he was convicted for? No, he's eligible for the death penalty. Right, eligible. Because of? You have to be eligible before you can get it. That's correct. And that's what the statute calls for. The Federal Death Penalty Act talks about a hearing. And prior to that hearing, certain things have to have occurred. It doesn't talk about prior to the offense. It talks about prior to the hearing. The Higgs Court specifically stated, we hold that. It wasn't dicta. It wasn't an expression of anything other than we hold that and went on to describe this very situation. Every court that has addressed it subsequently has agreed with the logic of Higgs. And these were trial court judges looking at a death notice and an indictment. Are those cases in which the eligibility was based solely on post-offense conviction? Not solely, but at the time. So are there any like that? Not that I know of. Okay. But at the time those decisions were made by those trial court judges, they had no idea which factors the jury could find. So they very well may be in a situation where those were the only statutory factors, statutory aggravating factors that the jury would have found beyond a reasonable doubt, and then we would have been in the same position that we are in this case. I'd point out that. Well, let me be clear about Higgs. Higgs didn't qualify its holding by saying, and we take comfort in the fact that there's an additional factor that we rely on, that we can rely on, right? That holding was unequivocal. The holding was unequivocal. They did say that in any event it was harmless because there were other statutory aggravators, but the language of the decision was we hold that, and then went on to describe the situation that the conduct that gives rise to the statutory aggravating factor can occur post-offense, and that is consistent. We've had categorical approaches required in this case. All these arguments are phenomenal, aren't they? They don't make any difference. Well, I think the short answer is yes, we would have to reanalyze the statutory aggravators according to a categorical approach, and whether I can see that at least for the gun offenses, the Arlington gun statute does not matter. The Arlington definition of a firearm is greater than the federal definition of a firearm. So we would have the state offense being larger than the generic offense. But I would point out that if you look at this statute, the federal death penalty statute, and you look at how the language is defined, these are not generic offenses of the kind in the Armed Career Criminal Act. These are not burglary or arson, some other offense that can be defined with a list of elements and then compared to a state offense. These are much more like the special circumstances of conduct in the, I will probably mispronounce it, the Nia Jawan versus Holder case, in which they distinguish between the categorical approach and a conduct-based approach, and they looked at the language of the statute, which in that case included conduct relating to aggravated felonies for immigration charges. And they said they just don't lend themselves under that categorical approach. They're not the type of offenses that you have in the Armed Career Criminal Act, which would lend themselves to a generic definition, and then you can compare elements to elements. But as pointed out in the Mathis case, there are real Sixth Amendment concerns here. And while Torres says, oh, the jury will still have something left to do, that's not really true. If you have a judicial finding according to the categorical approach, that this statutory aggravator is either in or out, we're done. There is no jury function left if the categorical approach would be applied. And this has to be a jury function. That has constitutional significance. We cannot write the jury out of the process. So why would you want to involve a jury in a complicated problem that we struggle with all the time, as to whether or not it's categorical or modified categorical? A jury still has to find that the offense was committed, though. It's not done and over when the judge says it's categorical. It's submitted to the jury. You still have to prove the offense occurred. But that's a perfunctory. May well be. I would submit it's not what is contemplated under the statute. What the statute contemplates is a serious felony offense for conduct involving a firearm. It's up to the jury to determine whether that conviction involved conduct involving a firearm. Now, it adds a definition, a type of firearm, which, again, I suggest, because Congress went so far as to specifically define the firearm from the federal side, it wasn't Congress's purpose that that should be applied to a state firearm offense. Otherwise, that really makes no sense. You would have this hodgepodge patchwork of offenses that would qualify under the categorical process. Well, and that's exactly right. And one of the functions of the death penalty statute, if properly applied, is to avoid this kind of arbitrary and capricious application of the statute, depending, in this case, if we applied the categorical, modified categorical approach, which the Supreme Court has suggested some frustration with, it would seem to me to be the height of arbitrariness, depending on the vagaries of the wording of state statutes. That doesn't make any sense to me. I agree, Your Honor. For example, a rape that is committed with a firearm, if the underlying rape statute doesn't define the firearm the same way the federal statute does, that's not a statutory aggravating factor. That could not be the intent of Congress. Congress was narrowing the class of offenders, not offenses, but offenders who are eligible for the death penalty. That's the whole purpose of the eligibility phase. To perform that narrowing function, we have to decide who are the worst of the worst in that context. That can only be decided by a jury in the context of determining whether the underlying conduct satisfies the statute. To apply a categorical approach, you could end up with people being eligible for the death penalty based upon relatively minor felonies involving firearms. That was not what Congress intended. Similarly, with offenses involving substantial bodily injury or the threat of substantial bodily injury, again, you could have a whole patchwork of offenses that might not be relatively serious offenses but would satisfy under the categorical approach but would be kicked out under this approach because of the way the States have worded their statute. I don't think that was what Congress intended. Again, when you go back to the Nijawan v. Holder case, that's the distinction that's made there that there are certain statutes where it's cut and dry. We're looking at elements. There are other statutes that are looking at what was the conduct that gave rise to the prior conviction, and that's what we're looking at under the federal death penalty statute. With respect to the argument that there's a certain arbitrariness between by having offenses that post-date the death-eligible offense, as here, we agree that the Arlington offenses were committed after the Snell murder. Torres did not become a suspect, a target of that investigation, until after evidence was obtained following the Snell murder or following the Arlington convictions. In other words, as one of the district judges said, I believe it was in the case out in California, which we cite in our brief in which this same issue had come up, serial killers that might commit offenses in different jurisdictions usually get caught after their last offense. We don't have the good fortune to catch people on their first offense. And that was the case here. When Torres was arrested in Arlington and his DNA was taken and he made statements to El Attari, this is when we then had a federal offense for the murder on federal property at Joint Base Fort Myer. That was what gave rise to the federal investigation and federal jurisdiction. Up to that point, we had an autopsy that said undetermined cause of death. We had NCIS agents not knowing whether this was even a homicide. But all those things came into play then once Torres was arrested in Arlington. So there was no arbitrariness here. There was no manipulation. There was no input by the federal prosecutors with respect to how this process would play out. The only input by federal prosecutors had to do with Mr. El Attari because he was a federal defendant being housed in Arlington. And when the issue came up as to whether the federal government would allow state investigators to use him as an informant and have him record conversations for Mr. Torres, they had to come to the federal prosecutors to get that permission. And that was what the federal involvement was at that point, not because they were investigating Torres for Snell's murder. I'd be happy to answer any other questions that the Court might have on any of the issues that are raised in the brief. Thank you very much. Thank you. I'd like to spend a couple minutes just correcting some of the statements that Government Counsel made with respect to the waiver issue and then turn back to the categorical approach issue, if I may. This issue with respect to Mr. Torres seeking to make certain waivers was actually first raised to the Court in an ex parte hearing on April 8, 2014, almost immediately after the jury returned its guilt-innocence verdict. The motion to withdraw was filed the next day. This hearing in which Mr. Torres was permitted to make these waivers didn't occur until April 21. So there was time in there to do a hearing, to do another evaluation. With respect to Defense Counsel's comment, I believe the statement they made was that they had left no stone unturned with respect to the mental health investigation. The two things that they cited were that they had performed an MRI and that the original trial team had had mental health experts look. But the court didn't actually make any follow-up and say, well, the first defense team was fired while their mental health investigation was going on. Did you follow up on that? Did you consult with any of those experts? If he had, he would have found out that the answer was no. And they did perform an MRI of Mr. Torres, but that was only one of three scans that had been suggested by Dr. Hyde, from the original defense team, and it was never reviewed by an expert. There was a report from a radiologist. So the court didn't, and again, the court could have looked at the CJA vouchers that were submitted for experts. There was not a single voucher submitted for a mental health expert. So there was no basis for the court to rely on Defense Counsel's representation that it had left no stone unturned. And again, the government took the position in February 2013, when Mr. Torres was first, was this issue about himself representing, and the government, appropriately so, said we need to make it very clear that he is competent and that there is a full, on-the-record colloquy that the government is participating in to make sure he understands the rights he's giving up. The government took the same position in May of 2014 when it assumed that Mr. Torres might want to waive his appellate rights. And again, the court, government knew, it had seen Dr. Ratner's evaluation, but it didn't believe that that would control. And, you know, again, we're not just talking about whether Mr. Torres was competent. Even though it is our position that there was ample reasonable cause for the judge to doubt that competence, we're also talking about that there's not, we don't have in this record any indication that Mr. Torres was making a knowing and intelligent waiver. Courts are supposed to indulge every presumption against the waiver of fundamental rights, and that's not what happened in this case. If Mr. Torres had, in fact, self-represented, for example, there would have been a very robust colloquy, and that simply didn't happen. We want to refer the court to the record. Joint Appendix 4406 is the only discussion that the court had with Mr. Torres on any issues other than mitigation, and it does not come close to satisfying that knowing and intelligent standard. The court asked whether there were other cases involving post-offense convictions. The only two we could find was the Jackson case out of Texas, which was a federal case, and then Pennsylvania v. Boskowski was the only state case that we could find. Now, in terms of the trifurcation, I want to be very clear that our argument does not depend on whether an individual case is trifurcated or bifurcated, whether it's the timing issue or the categorical approach issue. Our point is merely that the fact that in Higgs there was a bifurcated proceeding, that that influenced the court's verdict, because one of the concerns, for example, the court had on both of these issues was that the jury not be deprived of its ability to make an individualized sentencing determination. And respectfully, that's just a separate issue than the eligibility questions that we are raising. And turning just, I just want to turn back on a few of the categorical approach issues. The government said that we have, we don't have generic offenses that are here, and they gave the example of arson. Well, of course, the court doesn't limit the categorical approach to generic offenses. In the Armed Career Criminal Act, for example, there's the enumerated offense of offenses involving the use of explosives, and, of course, the residual clause when it was still in place. And the court said the categorical approach applies to those as well. And in Nijuan, that was a very different type of statute that was very fact-specific, and, again, it referred to a conviction in which certain conduct took place. This is an offense involving. And this court in Prudencio, which was after Nijuan, rejected the same argument by the government and said that an offense involving moral turpitude still required application of the categorical approach. As for the concerns. About the precedent with respect to that issue, all we have is district court precedent applying the categorical approach to the death penalty statute. Is that right? Yes, Your Honor. That's the only case we could find, the Smith case out of Louisiana, that applied the categorical approach. And in terms of how the jury function would work, I would respectfully draw the court's attention to the eligibility verdict form in this case. And the verdict form would look the same in a case involving the categorical approach, assuming that they qualified. Thank you very much. Thank you. The court will come down and greet counsel and move on to our next case.
judges: Albert Diaz, Henry F. Floyd, Stephanie D. Thacker